**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| **PHILADELPHIA INDEMNITY INSURANCE COMPANY,** | No. 1:18-cv-01190 |
| Plaintiff, | **COMPLAINT FOR DECLARATORY JUDGMENT** |
| vs. | |
| **HIDALGO MEDICAL SERVICES; and KAIYRA SALCIDO** | |
| Defendants. | |

Plaintiff Philadelphia Indemnity Insurance Company ("Philadelphia") hereby alleges the following for its Complaint against Defendants Hidalgo Medical Services ("HMS") and Dr. Kaiyra Salcido ("Salcido") (collectively, "Defendants"):

**PARTIES, JURISDICTION AND VENUE**

1. This case arises out of an insurance coverage dispute regarding the amount of the liability insurance coverage limits available to HMS under an insurance policy issued by Philadelphia for two related claims for sexual harassment, retaliation and gender discrimination against HMS' Chief Executive Officer, Dan Otero.

2. Plaintiff Philadelphia is a corporation organized under the laws of the State of Pennsylvania with its principal place of business in Pennsylvania.

3. Defendant HMS is a corporation organized under the laws of the State of New Mexico with its principal place of business in Lordsburg, New Mexico.

4. Defendant Salcido is a resident of Grant County, New Mexico.

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. A justiciable controversy exists between Philadelphia and Defendants as to whether the policy limits are $1,000,000 or $2,000,000.

1

6. This Court has personal jurisdiction over Defendants because Defendants are domiciled in the State of New Mexico.

7. Venue is proper in the United States District Court for the District of New Mexico pursuant under 28 U.S.C. § 1391(b)(1), 1391(c)(2), and 1391(b)(2) because Defendants reside in the state of New Mexico for venue purposes and a substantial part of the events or omissions giving rise to Philadelphia's request for declaratory judgment took place in New Mexico, and the underlying actions were filed in New Mexico: *Lassiter v. Hidalgo Medical Services, et. al*., Case No. 2:17-cv-850 (D.N.M) (the "Lassiter Lawsuit") and *Salcido v. Hidalgo Medical Services*, Case No. D-608-CV-2017-00381 (N. Mex. Super. Ct.) (the "Salcido Lawsuit").

## GENERAL ALLEGATIONS

*The Underlying Actions Against HMS' CEO Dan Otero*

8. The underlying actions involve two sexual harassment, gender discrimination and retaliation claims by Dr. Salcido and Veronica Lassiter ("Lassiter"), against HMS' CEO, Mr. Otero.

9. HMS hired Mr. Otero on or about February 22, 2016.

10. Shortly after he was hired, it is alleged that Mr. Otero began to engage in a pattern and practice of sexually harassing females employed by HMS, including Ms. Lassiter and Dr. Salcido.

11. According to Ms. Lassiter and Dr. Salcido, Mr. Otero's sexual harassment followed a similar pattern in which he would, among other things, stare at the females in a sexually suggestive manner, embrace female employees in a sexual manner by pushing his chest into the chest of female employees, pushing his groin into the groin area of female employees and placing his hand on the shoulders of female employees and running it down their backs and onto the top of their buttocks.

12. Based on the foregoing allegations of sexual harassment, gender discrimination and retaliation, Ms. Lassiter and Dr. Salcido all filed charges of discrimination against Mr. Otero and HMS.

13. Ms. Lassiter and Dr. Salcido also filed civil actions against HMS and/or Mr. Otero.

14. On October 23, 2018, the Lassiter Lawsuit settled.

A. *The Lassiter Lawsuit*[1]

15. Ms. Lassiter was the Chief Operating Officer of HMS.

16. Ms. Lassiter had been employed by HMS since 1995.

17. Ms. Lassiter alleged that Mr. Otero sexually harassed her and ultimately retaliated against her by terminating her employment when she rejected his sexual advancements.

18. From February 2016 to December 20, 2016, Ms. Lassiter alleged that she was treated worse due to her gender and subject to sexual harassment and retaliation by Mr. Otero.

19. Ms. Lassiter alleged that she repeatedly told Mr. Otero to stop sexually harassing her, to stop giving her sexual hugs, to stop asking her to travel with him, and to stop asking her to have drinks or dinner with him.

20. Ms. Lassiter alleged that because she rejected Mr. Otero's sexual advances, she was retaliated against and ultimately fired from HMS.

21. For example, Ms. Lassiter alleged that in September of 2016, Mr. Otero took retaliatory action against her, including downgrading her written employment contract by lowering the term of Ms. Lassiter's contract from five years to three and eliminating the severance provision in the event she was terminated.

22. On November 14, 2016 at 6:58 am, Mr. Otero emailed Ms. Lassiter stating that "it would be nice if we can travel together on this trip".

23. At or around 9:00 am on November 14, 2016, Ms. Lassiter went into Mr. Otero's office and again told him she was not going to travel with him and to quit asking her to travel.

24. That same morning, around 9:00 am, Mr. Otero told Cathy Diaz ("Diaz") that he had decided to place Ms. Lassiter on paid administrative leave pending an investigation into Medicaid billing issues and the Federal False Claims Act.

---

[1] The factual basis set forth in this section comes from the pleadings filed in the Lassiter Lawsuit.

25. At 11:00 am, Mr. Otero and Ms. Diaz met with Ms. Lassiter and placed her on paid administrative leave pending two internal investigations.

26. Ms. Lassiter alleged that Mr. Otero's investigation was retaliation for her denying his sexual advances.

27. Prior to reporting and opposing discrimination, Ms. Lassiter alleged that she was not reprimanded in writing.

28. The day after Ms. Lassiter was placed on paid administrative leave, she contacted HMS board member Priscilla Perea and made remarks to the effect of: "If they want to do something, I'm not going away quietly."

29. HMS warned Ms. Lassiter not to contact HMS board members or employees while on paid administrative leave.

30. Upon learning that Ms. Lassiter had contacted HMS board employees and board members, HMS issued a Second Notice of Paid Administrative Leave & Written Warning to Ms. Lassiter on December 13, 2016, which opened up a third investigation into whether Ms. Lassiter was contacting HMS board members.

31. Ms. Lassiter was warned, in writing, to refrain from discussing either of the pending investigations or other personal issues with HMS board members or employees, however during HMS' investigation it was revealed that she did contact HMS board members or employees.

32. Ms. Lassiter alleged that this third investigation was concocted because Mr. Otero knew the first two investigations would not provide a basis for termination.

33. On December 20, 2016, in light of Ms. Lassiter's continued contact with HMS board members or employees, HMS terminated Ms. Lassiter for insubordination, failure to cooperate with an investigation, unsatisfactory conduct and dishonesty.

34. On February 13, 2017, Ms. Lassiter filed a charge with the EEOC.[2]  Ms. Lassiter alleged that Mr. Otero "treated [her] worse due to [her] gender," including: (1) hugging her in a

---

[2] The EEOC charge is dated January 10, 2017, which is the date Plaintiff alleges she filed her charge of discrimination with the New Mexico Human Rights Bureau.

"sexual way"; (2) making sexual comments to her, such as wanting to "travel together, go to dinner, have drinks together and get to know [her]"; (3) making comments regarding her clothing; (4) touching her in a sexual way, such as "coming up behind [her] and putting his hands around [her] stomach" and invading her space; (5) Ms. Lassiter repeatedly told Mr. Otero to stop and rejected his sexual advances; (6) Mr. Otero asked her personal and inappropriate questions, such as why she was taking Family Medical Leave Act; (7) female employees are treated worse than male employees; and, (8) retaliation for reporting billing issues, gender discrimination, and rejecting Mr. Otero's advances.

35. On August 18, 2017, Ms. Lassiter filed a complaint against HMS and Mr. Otero for 12 causes of action:  1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) termination in violation of Title VII; (4) termination in violation of the NMHRA; (5) harassment in violation of Title VII; (6) harassment in violation of the NMHRA; (7) quid pro quo in violation of Title VII; (8) quid pro quo in violation of the NMHRA; (9) retaliation in violation of Title VII; (10) retaliation in violation of the NMHRA; (11) intentional interference with contract; and (12) battery.

36. The Lassiter Lawsuit settled on October 23, 2018.

37. HMS consented to the amount of the settlement in the Lassiter Lawsuit with full knowledge and understanding of Philadelphia's position that there was only $1 million in coverage available for the Lassiter and Salcido claims.

**B.    The Salcido Lawsuit[3]**

38. Dr. Salcido is a dentistry practitioner.

39. Dr. Salcido started working at HMS in July 2012.

40. On April 15, 2015, Dr. Salcido was promoted to the position of Chief Dental Officer for HMS and held that position until October 2, 2017, when she alleges she was constructively discharged by HMS.

---

[3] The factual basis set forth in this section comes from the pleadings filed in the Salcido Lawsuit.

5

41. Dr. Salcido alleges that shortly after Mr. Otero was hired in February 2016, he targeted and sexually harassed her by offensively touching her, staring at her in a sexual way, hugging her against her will and treating her like a sexual objection.

42. Dr. Salcido also alleges that after Mr. Otero was hired, he had a pattern and practice of requiring Dr. Salcido to meet with him alone, on a one on one basis with no other person present.

43. In May of 2016, Dr. Salcido alleges that after enduring months of harassment and differential treatment based on her gender, Dr. Salcido reported to HMS' then COO, Ms. Lassiter, that she felt uncomfortable meeting with Mr. Otero alone in the frequent one-on-one meetings he insisted on having with Dr. Salcido.

44. After Dr Salcido reported the sexual harassment and discrimination to HMS, she alleges that HMS and Mr. Otero took a series of actions against Dr. Salcido in retaliation for her having reported Mr. Otero's sexual harassment.

45. For example, after May of 2016, Dr. Salcido alleges that Mr. Otero placed requirements on Dr. Salcido which he did not place on other similarly situated male employees such as requiring her to provide Mr. Otero with pro forma analyses, estimated costs of and estimated profits to be generated by the projects that Dr. Salcido proposed be implemented by HMS and delaying and refusing to provide her with needed staff.

46. In September of 2016, Dr. Salcido told Mr. Otero that she did not want to meet alone with him and that she did not want him to embrace her in any manner. Mr. Otero's only response was to ask Dr. Salcido if she was trying to undermine him.

47. On February 14, 2017, Dr. Salcido told Mr. Otero that she was tired of being treated by him differently than similarly situated male employees because of her gender. Mr. Otero's only response was to tell Dr. Salcido he had to write what she said down in order to protect himself.

48. Two weeks later, an investigator hired by HMS interviewed Dr. Salcido about the complaint filed by Ms. Lassiter. Dr. Salcido alleges that she told the investigator about the details of the harassment she experienced at the hands of Mr. Otero, her attempts to report the harassment within HMS and her understanding that prior complaints against Mr. Otero had gone unaddressed

by HMS. After Dr. Salcido characterized Mr. Otero's actions as those of a sexual harasser, she alleges she was told by the investigator that she should choose her words more carefully.

49. Two weeks after that investigation, Dr. Salcido alleges that Mr. Otero initiated a series of retaliatory actions against Dr. Salcido, including opening numerous investigations.

50. For example, in the first weeks of March 2017, Mr. Otero told Dr. Salcido that she was under investigation for alleged fraudulent billing within the dental clinic. This investigation did not yield any evidence to support the allegations and no action was taken by HMS against Dr. Salcido.

51. This was the first of four investigations of Dr. Salcido which occurred after she spoke with the investigator hired by HMS.

52. Prior to reporting and opposing discrimination, Dr. Salcido alleges that she was not reprimanded in writing and had received excellent performance evaluations from her previous supervisors.

53. In mid-June 2017, Dr. Salcido was instructed to complete an incident report for her treatment of a patient with a partial denture stuck in her throat, but refused because such reports are only required when there is an adverse outcome on a patient and said patient had a successful outcome.

54. On June 23, 2017, August 9, 2017 and October 25, 2017, Dr. Salcido filed complaints of gender discrimination, hostile work environment and retaliation with the New Mexico Human Rights Bureau.

55. Less than a month after Dr. Salcido filed her first charge of discrimination, HMS and Mr. Otero initiated another investigation of an allegation that Dr. Salcido bullied an employee.

56. On July 27, 2017, Dr. Salcido met with Ms. Diaz to discuss the alleged bullying and Ms. Diaz attempted to require Dr. Salcido to sign a non-disclosure agreement. Dr. Salcido refused and tried to report Mr. Otero's sexual harassment.

57. On August 1, 2017, Dr. Salcido was disciplined for the first time and given a written reprimand. On that same day, HMS accused Dr. Salcido of violating HIPPA and disclosing confidential patient information to unauthorized parties.

58. On August 29, 2017, after Dr. Salcido filed her second charge of discrimination, HMS placed Dr. Salcido on paid administrative leave until October 2, 2017 for, among other things, being non-compliant in the investigation of the patient with lodged partial in her throat.

59. On October 2, 2017, HMS delivered a second written warning and performance improvement plan to Dr. Salcido, which required, among other things that Mr. Otero would evaluate Dr. Salcido, and required her to meet more frequently with Mr. Otero. Dr. Salcido refused to sign either document, refused to return from leave and HMS accepted her resignation effective October 3, 2017.

60. On November 10, 2017, Dr. Salcido filed a ccomplaint against HMS in the Sixth Judicial District Court of New Mexico State Court alleging four cases of action: (1) termination in violation of the New Mexico Human Rights Act (NMHRA); (2) harassment in violation of the NMHRA; (3) retaliation in violation of the NMHRA (participation clause); and (4) retaliation in violation of the NMHRA. The Salcido Lawsuit is currently in active litigation.

*The Philadelphia Policy*

61. Philadelphia issued a claims-made Commercial Lines Policy, policy number PHSD1183790 to HMS with an effective date of October 1, 2016 to October 10, 2017 ("the Policy").

62. Under the Policy "the Limit of Liability specified on the Declarations hereof shall be the maximum liability for 'loss' for all 'claims' for each 'policy period.'"

63. The Policy defines "Claim" as "1. Any suit; 2. Any proceeding before an administrative agency once it has concluded its investigative phase (if applicable); or 3. Any written notice received by The Company of an insured demanding the payment of money or provision of services to redress a wrongful act."

64. The Policy defines "Wrongful Act" as "any actual or alleged:

8

    1. employment practice act; or

    2.
- a. act;
- b. error;
- c. omission;
- d. misstatement
- e. misleading statements; or
- f. neglect or breach of duty; not included in 1 above."

65. The Policy defines "Employment practice act" as "any actual or alleged:

1. Termination of or interference with an employment relationship in a manner which is against the law and wrongful or in breach of a written or implied agreement to continue employment;

2. Discrimination in connection with the actual or anticipated employment of any person because of such person's race, color, religion, age, sex, national origin, disability, pregnancy or other protected status;

3. Unwelcome sexual advances, requests for sexual favor or other verbal or physical contact of a sexual nature that are made a condition of employment, are used as a basis for employment decisions, or creates a work environment which is intimidating or interferes with performance."

66. The Limits of Liability section of the Policy states that "Claims based on or arising out of the same wrongful act, interrelated wrongful acts, or a series of similar or related wrongful acts shall be:

1. Considered a single claim; and

2. Considered first made only during the policy period, including the Extension Period, (if applicable), or during any prior or subsequent policy period in which the earliest claim arising out of such wrongful act(s) was first made. Such claims whenever made, shall be assigned to only one policy (whether issued by this or any other insurer) and if that is this Policy, only one Limit of Liability and one Retention shall apply."

67. All relevant times, Philadelphia has made clear that the Lassiter and Salcido claims are a single claim under the Policy and subject to one set of Policy limits because the claims share common factual allegations (sexual harassment, discrimination and retaliation) that involve one common actor, Mr. Otero.

*The Endorsement to Change Policy Limits from $1,000,000 to $2,000,000*

68. When the Policy was bound on September 26, 2016, the initial Limit of Liability on the Declarations page was $1,000,000.

69. Philadelphia changed the Policy limits from $1,000,000 to $2,000,000 on February 6, 2017 based exclusively on statements from Mr. Otero.

70. The endorsement to change the Policy limit states:

**INCREASED LIMIT OF LIABILITY AMENDATORY ENDORSEMENT**

With respect to the $ 1,000,000 excess of $ 2,000,000 Limit of Liability, it is understood and agreed that the Company shall not be liable to make any payment for "Loss" and/or "Defense Costs" in connection with any "Claim" made against the "Insured" which is based upon, attributable to or arising out of any "Wrongful Act" which occurred prior to 10/01/2016 if on such date the "Insured" knew or could have reasonably foreseen that such a "Wrongful Act" could give rise to a "Claim".

It is further understood and agreed that with respect to the $ 1,000,000 excess of $ 2,000,000 of Liability, the Company shall not be liable to make any payment for "Loss" and/or "Defense Costs" in connection with any "Claim" made against the "Insured" with is based upon, attributable to or arising out of any pending or prior litigation as of 10/01/2016 , as well as all future "Claims" based upon the pending or prior litigation or the facts or circumstances (actual or alleged) that on which such prior or pending litigation is based.

All other terms and conditions of this Policy remain unchanged.

71. The endorsement regarding the additional limits makes clear that the additional coverage will not be available for claims "based upon, attributable to or arising out of any 'Wrongful Act' which occurred prior to 10/01/16 if on such date the 'Insured' knew or could have reasonably foreseen that such a 'Wrongful Act' could give rise to a 'Claim.'"

72. The request for the additional coverage was initiated on November 14, 2016 at precisely 7:00 am, when Mr. Otero sent an email to Jim Hoy to discuss D&O insurance coverage, including "Coverage currently" and "Cost to Increase Coverage Amount."

73. Nine minutes later, at 7:09 am, Mr. Otero commenced the process of placing Ms. Lassiter on administrative leave from HMS.

74. Later that day, Jim Hoy emailed Dan Dolan ("Dolan"), the insurance agent for HMS, to set-up a call to discuss Dan Otero's email request.

75. On November 15, 2016, Mr. Dolan had a phone call with Joe Mendicelli ("Mendicelli"), Senior Underwriter for Philadelphia.  Per their discussion, Mr. Mendicelli provided Mr. Dolan the "ball park" premium for increased Policy Limits for $2 million and $3 million.

76. On November 17, 2016, Mr. Dolan emailed Mr. Mendicelli to see if Philadelphia would "consider increasing the limits now", that he "expected [HMS] would really like to increase coverage to 2MM", that "[d]ue to a slight disconnect between the board, the CEO/CFO and I on renewal review, this was missed," that he should have proposed $2 million to the board, and that "at any rate I am 100% positive they are not buying because of knowledge of something around the corner and can have a no known loss letter signed."

77. Mr. Mendicelli responded via email to Mr. Dolan that an increase in policy limits would have to be reviewed and considered by upper management at Philadelphia and would require "at minimum" a current "No Known Loss Letter".

78. On January 12, 2017, Dan Otero signed a Statement of No Known Losses in which stated:

> To Whom It May Concern:
>
> This letter is to clarify that that we as a board and individuals are unaware of any incident, accident, circumstance, that a reasonably prudent person might expect to give rise to a claim or lawsuit whether valid or not, which might involve us from October 1st, 2016 to current with the exception of a justified termination of a senior executive.
>
> Sincerely
>
> *[signature: Dan Otero]*
>
> Mr. Dan Otero
> CEO

79. On January 30, 2017, Mr. Otero emailed Mr. Dolan the Statement of Known Losses dated January 12, 2017 and asked, "when can we complete this increase of coverage."

80. Mr. Dolan emailed the Statement of No Known Losses to Mr. Mendicelli on January 31, 2017.

81. Mr. Mendicelli forwarded the Statement of No Known Losses to upper management on January 31, 2017 and was told that HMS would need to complete a Broadening of Coverage Warranty Letter.

82. Mr. Mendicelli provided the Broadening of Coverage Warranty Letter to Mr. Dolan on January 31, 2017.

83. Mr. Otero executed the Broadening of Coverage Warranty Letter, which is dated January 30, 2017.

84. In that document, Mr. Otero warranted that no one at HMS was aware of any "fact, circumstance or situation which he or she may have reason to believe might give rise to a future claim…."

85. Mr. Otero provided the executed Broadening of Coverage Warranty Letter to Mr. Dolan on February 6, 2017, which was forwarded to Mr. Mendicelli.

86. Philadelphia relied upon Mr. Otero's avowals, and agreed to provide HMS with additional aggregate limits of coverage on February 6, 2017.

87. A week after the Limits of Liability was increased from $1,000,000 to $2,000,000, Ms. Lassiter filed her EEOC charge against Mr. Otero and HMS.

88. In realty, Mr. Otero and/or HMS were well aware that Ms. Lassiter already had threatened to make a claim against HMS.

89. The majority of Ms. Lassiter's claims for sexual harassment all include allegations of conduct that commenced in February 2016 when Mr. Otero was hired.

90. On November 15, 2016, a day after being placed on leave, Ms. Lassiter called HMS board member Priscilla Perea and made threatening remarks to the effect of: "if they want to do something, I am not going away quietly."

91. HMS and Mr. Otero were aware that Ms. Lassiter contacted Ms. Perea because they issued a Second Notice of Paid Administrative Leave & Written Warnings on December 13, 2016 for this and other communications Ms. Lassiter had with HMS board members and employees.

92. With respect to the reasonable foreseeability of a claim arising from such conduct, Ms. Lassiter's expert has noted that by "November 16, 2016, Mr. Otero stated the biggest concern was the suspended employee (Ms. Lassiter) would file a whistleblower claim."

93. That date was months before Mr. Otero signed the form in which he avowed to Philadelphia that he was unaware of any circumstances that might give rise to a claim.

94. Furthermore, on January 3, 2017, before Mr. Otero signed the No Known Loss Letter and the Broadening of Coverage Warranty Letter, Ms. Lassiter left a voicemail, which was forwarded to Ms. Perea that stated: "Vero is taking HMS to court.  She's bringing up old shit that has to do with $2.5 Mil., that's gonna cause some shit."

95. Mr. Otero and/or HMS knew or could have reasonable foreseen a "Wrongful Act" claim prior to October 2016 and certainly before Mr. Otero executed the No Known Loss Letter and the Broadening of Coverage Warranty Letter based on the allegations of sexual harassment, gender discrimination and retaliation claims of Lassiter and/or Salcido.

## COUNT I—DECLARATORY JUDGMENT

96. Philadelphia realleges and incorporates by reference the allegations contained in paragraphs 1-95 above as if fully set forth herein.

97. A justiciable dispute and actual controversy exists between Philadelphia and Defendants concerning the extent of Philadelphia's duty to indemnify HMS against the Lassiter and Salcido claims.

98. All relevant times, Philadelphia has made clear that the $1,000,000 liability limits of the Policy are available for use in resolving the Lassiter and Salcido claims.

99. The settlement of the Lassiter and Salcido matters may exceed the $1,000,000 liability limits of the Policy.

100. Philadelphia seeks a judicial declaration that it has no obligation under the Policy or under applicable law to indemnify HMS in excess of $1,000,000 for the Lassiter and Salcido claims.

## PRAYER FOR RELIEF

WHEREFORE, Philadelphia prays for judgment against HMS as follows:

1. For a judicial determination declaring that the Policy does not obligate Philadelphia to indemnify HMS in excess of $1,000,000 for the Lassiter and Salcido claims at issue;

2. For an award of pre-judgment interest at the maximum legal rate;

3. For all costs of suit incurred herein, including Philadelphia's attorneys' fees incurred in bringing this matter before the Court; and

4. For such other and further relief as the Court may deem just and proper.

Dated this 18th day of December, 2018,

                By: /s/ Gena L. Sluga
                   Gena L. Sluga, State Bar No. 147998
                   CHRISTIAN DICHTER & SLUGA, P.C.
                   2700 N. Central Avenue, Suite 1200
                   Phoenix, AZ 85004
                   Tel: (602) 792-1700
                   Fax: (602) 792-1710
                   *Attorney for Plaintiff Philadelphia Insurance Company*